[Nos. 80357-9; 80366-8. En Banc.]
Argued June 24, 2008. Decided April 2, 2009.

RAJVIR PANAG, *on Behalf of Herself and All Others Similarly Situated, Respondent*, v. FARMERS INSURANCE COMPANY OF WASHINGTON ET AL., *Petitioners*.

MICHAEL STEPHENS, *on Behalf of Himself and All Others Similarly Situated, Respondent*, v. OMNI INSURANCE COMPANY, *Defendant*, CREDIT CONTROL SERVICES, INC., *Petitioner*.

28

John A. Granger; Melissa O'Loughlin White and Kevin A. Michael (of Cozen O'Connor); Philip A. Talmadge (of Talmadge/Fitzpatrick); and Margarita Latsinova and Stevan D. Phillips (of Stoel Rives, LLP), for petitioners.

Matthew J. Ide (of Ide Law Offices) and Murray T. Stakesby Lewis, for respondents.

John E. Woodring on behalf of ACA International, amicus curiae.

Thomas A. Wolfe on behalf of National Association of Subrogation Professionals, amicus curiae.

Kelby D. Fletcher, Sarah C. Schreck, and Bryan P. Harnetiaux, on behalf of Washington State Association for Justice Foundation, amicus curiae.

Timothy C. Layton on behalf of Washington Liability Reform Coalition, amicus curiae.

Melvin N. Sorensen and Clifford A. Webster on behalf of American Insurance Association and Property Casualty Insurers Association of America, amici curiae.

Shannon E. Smith, Senior Counsel, on behalf of the Attorney General of Washington, amicus curiae.

¶1 MADSEN, J. — These consolidated cases present the issue whether the Consumer Protection Act (CPA), chapter 19.86 RCW, applies to a collection agency's allegedly deceptive efforts to collect on an insurance company's subrogation claim against an underinsured motorist. Petitioners, Credit Control Services and its client insurance companies, contend persons who receive allegedly deceptive insurance subrogation collection notices lack standing to bring a CPA claim because the CPA applies only to disputes arising from a consumer or business transaction, not an alleged tort. Petitioners also contend the collection notices at issue are not deceptive and the respondents failed to establish injury. The Court of Appeals affirmed the trial court's grant of partial summary judgment in favor of one of the respondents and reversed summary judgment of dismissal in the case of the other respondent on these issues, and remanded for trial. *Stephens v. Omni Ins. Co.*, 138 Wn. App. 151, 159 P.3d 10 (2007). We affirm the Court of Appeals.

## FACTS

¶2 Rajvir Panag and Michael Stephens were involved in automobile accidents. The drivers of the other cars claimed underinsured motorist benefits from their respective insurance providers, Farmer's Insurance, in Panag's case, and Omni Insurance, in Stephens' case.

¶3 A Farmer's insurance adjuster concluded Panag was 40 percent at fault and its insured was 60 percent at fault. The adjuster contacted Panag's insurance provider and determined her policy was canceled for nonpayment of the premium three weeks before the accident. Panag retained an attorney to dispute the cancellation of her insurance and to pursue a personal injury claim against the other driver.[1]

---

[1] Panag subsequently withdrew her challenge to the cancellation of her insurance policy.

Farmer's retained a collection agency, Credit Control Services (CCS), to recover the full amount it had paid on the claim.

¶4 Doing business as "Credit Collection Services," CCS sent to Panag a self-styled "FORMAL COLLECTION NOTICE," which displayed the seals of two collection agency associations. Clerk's Papers (CP) (Panag) at 768. The notice alleged Panag owed the "AMOUNT DUE" of $6,442.53, which was the full amount Farmers had paid its insured. The notice included a detachable form for remitting credit card information. After Panag failed to respond, CCS sent additional letters, taking an increasingly urgent tone. The second one warned of "ACTIVITY PENDING," and advised her to "[a]ct immediately." CP (Panag) at 772. The third one contained a "WESTERN UNION" header and warned that if CCS determined "VOLUNTARY COLLECTION" was "IMPOSSIBLE," Panag could be subject to additional penalties, including license suspension, litigation costs ("WHICH COULD INCLUDE INTEREST, COURT COSTS AND SHERIFF FEES"), and "any other method" of collection allowable by law. *Id.* at 775.

¶5 Panag ultimately obtained a $4,500 settlement from Farmers in connection with her personal injury claim. She then filed a class action, alleging the collection methods Farmers and CCS engaged in constituted an unfair and deceptive business practice in violation of the CPA. Panag's alleged injuries included expenses incurred in investigating the true legal status of the alleged debt, including out-of-pocket expenses for driving, parking, postage, and consulting an attorney.

¶6 In Stephens' case, an insurance adjuster determined Stephens was at fault and sent him a bill requesting $444.09 as reimbursement for property damage to its

insured's car. Stephens remitted a check for that amount but did not report the claim to his insurance company.[2]

¶7 Omni had no further contacts with Stephens. But over the next six months, Omni paid its insured more than $6,000 on a bodily injury claim arising from the accident. It then retained CCS to recover its subrogation claim against Stephens.

¶8 CCS sent Stephens a "FORMAL COLLECTION NOTICE" on the same form it sent to Panag, demanding payment of $6,412. CP (Stephens) at 68, 74-75, 388. Stephens called CCS and disputed the alleged debt. A CCS agent allegedly told him the account was "in 'collection' " and indicated there was nothing he could do about it. *Id.* at 68-69. As in Panag's case, CCS sent a second letter, threatening legal action and warning Stephens to "[a]ct immediately." *Id.* at 69, 77, 390.

¶9 Stephens referred the claim to his insurance company, which accepted the claim and paid it in full. *Id.* at 251-53, 255-56, 258-59, 386. Like Panag, Stephens brought a class action suit against Omni and CCS. He alleged he took substantial time away from his business to investigate the collection notices, resulting in a loss of business profits. He also alleged incidental damages, including the cost of purchasing a credit report and a credit monitoring service, parking, wear and tear on his car, and consulting with an attorney to ascertain the legal status of the alleged debt.

¶10 The trial court granted partial summary judgment in favor of Stephens as to liability and reserved ruling on the amount of damages. In Panag's case, the trial court granted the defendant's motion for dismissal on summary judgment, ruling Panag failed to establish injury.

¶11 The Court of Appeals granted discretionary review and linked the cases. The court affirmed the trial court in Stephens' case and reversed the trial court in Panag's case. *Stephens*, 138 Wn. App. 151.

---

[2] According to Stephens, he was not sure if his insurance covered the car he was driving at the time of the accident and decided to pay out-of-pocket. CP (Stephens) at 68, 216.

## ANALYSIS

 ¶12 Washington's CPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020. The purpose of the CPA is to "complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts and practices in order to protect the public and foster fair and honest competition." RCW 19-.86.920; *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 169, 744 P.2d 1032, 750 P.2d 254 (1987). The CPA is to be "liberally construed that its beneficial purposes may be served." RCW 19.86.920; *Short v. Demopolis*, 103 Wn.2d 52, 61, 691 P.2d 163 (1984).

 ¶13 The CPA's citizen suit provision states that "[a]ny person who is injured in his or her business or property" by a violation of the act may bring a civil suit for injunctive relief, damages, attorney fees and costs, and treble damages. RCW 19.86.090. To prevail in a private CPA claim, the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784, 719 P.2d 531 (1986).[3]

¶14 CCS contends that the respondents lack standing to bring suit under the CPA, that the respondents have failed to establish that the collection notices are unfair or deceptive, and that respondent Panag has not shown sufficient injury for purposes of a CPA claim.

¶15 Turning first to CCS's contention that respondents lack standing, CCS contends the *Hangman Ridge* test

---

[3] A CPA claim may be predicated on either a per se violation of the statute or on deceptive practices unregulated by statute but involving the public interest. *Anhold v. Daniels*, 94 Wn.2d 40, 614 P.2d 184 (1980); *Lidstrand v. Silvercrest Indus.*, 28 Wn. App. 359, 623 P.2d 710 (1981). Here, the claims are predicated on deceptive practices.

states the elements of proof necessary to prevail in a CPA action, but does not address the threshold issue of standing. CCS asks us to hold the CPA applies only to disputes arising from a consumer or business transaction and that only a consumer or someone in a business relationship can bring a private cause of action under the CPA. CCS maintains that the CPA does not apply to individuals who complain of unfair or deceptive efforts to collect on an insurance subrogation claim because the alleged conduct is not consumer-oriented. CCS contends a court must decide whether the plaintiff has standing to bring a CPA claim before applying the five-part *Hangman Ridge* test.

¶16 We decline CCS's invitation to address standing as a separate requirement. As the Court of Appeals recognized, the *Hangman Ridge*-test incorporates the issue of standing, particularly the elements of public interest impact and injury. *See* Michelle L. Evans, Annotation, *Who is a "Consumer" Entitled to Protection of State Deceptive Trade Practice and Consumer Protection Acts*, 63 A.L.R.5TH 1 (1998) (annotating cases that limit standing based on a consumer relationship, public interest impact, or both). As this court stated in *Hangman Ridge*, a "successful plaintiff is one who establishes all five elements of a private CPA action." *Hangman Ridge*, 105 Wn.2d at 795. We will not adopt a sixth element, requiring proof of a consumer transaction between the parties, under the guise of a separate standing inquiry.

¶17 Nor do we agree with CCS's contention that a CPA claim must arise from a consensual consumer or business transaction and that it must be consumer oriented. Petitioners urge us to adopt a bright line rule that the CPA applies only to disputes predicated on a consensual consumer or business transaction, "and should not apply at all in the fundamentally dissimilar context of adversarial tort disputes." Suppl. Br. of Pet'r CCS at 8.

¶18 In CCS's view, the CPA is designed to provide heightened protection only for individuals involved in certain "protective relationship[s]." *Id.* at 6. It asserts the

primary justification for the generous protections afforded by the CPA, including a relaxed standard of proof, attorney fees, and treble damages, is that deceptive business practices are particularly blameworthy because individuals who enter into a consensual transaction for goods or services reasonably rely on one another to act honestly and reliably. According to CCS, tort adversaries do not require heightened protection because they "are expected to make aggressive contentions and lack any form of mutual reliance that could lead to a reasonable expectation of quasi-fiduciary treatment." CCS Br. in Answer to Amici Curiae Br. at 10.

¶19 The CPA itself, the purposes for which it was enacted, and our cases do not support the argument that a CPA claim must be predicated on an underlying consumer or business transaction. The CPA allows "[a]*ny person* who is injured in his or her business or property by a violation" of the act to bring a CPA claim. RCW 19.86.090 (emphasis added). Nothing in this language requires that the plaintiff must be a consumer or in a business relationship with the actor. Further, the "violation" referred to occurs when the actor employs "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. "Trade" and "commerce" are defined terms under the CPA to "include the sale of assets or services, *and any commerce directly or indirectly affecting the people of the state of Washington.*" RCW 19.86.010(2) (emphasis added). An actionable violation can occur without any consumer or business relationship between the particular plaintiff bringing a private cause of action under the CPA and the actor because "trade or commerce" is not limited to such transactions.

¶20 What is necessary, and does constitute the needed link between the plaintiff and the actor, is that the violation cause injury to the plaintiff's business or property as required by RCW 19.86.090. However, while RCW 19-.86.090 requires such injury, and thus a connection between the wrongdoing (the wrongdoer) and the plaintiff, it does not require that the plaintiff be in a consumer or

other business relationship with the actor. Under the plain language of the act, it is not necessary to establish any consumer relationship, direct or implied, between the parties.[4]

¶21 Additionally, CCS misstates the purpose of the CPA. There is no merit to CCS's assertions that the CPA's purpose is to provide heightened protection only for individuals involved in certain "protective relationships." The act is not intended to protect only those individuals who enter into a consensual transaction for goods or services, and it is not intended to satisfy "reasonable expectations" of "quasi-fiduciary treatment."

¶22 Rather, the legislature explicitly identified the purposes of the act: "to complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts or practices *in order to protect the public and foster fair and honest competition.*" RCW 19.86.920 (emphasis added). Here, because we are specifically concerned with claims involving "unfair or deceptive acts or practices in the conduct of any trade or commerce," RCW 19.86.020, the purpose at issue is protection of the public. A plaintiff bringing a CPA action can serve the goal of protecting the public regardless of whether that person is a consumer or in a business relationship with the actor. The express purposes of the act do not mandate that the plaintiff must be a consumer or in a business relationship with the alleged violator.

¶23 The CPA also mandates that it be liberally construed to serve its purposes, RCW 19.86.920, and we will not narrowly construe the act by importing a requirement that the plaintiff be a consumer or be in a consensual business

---

[4] We recognize that the law in some other jurisdictions is different; some states limit a private right of action to consumers. *See, e.g., Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169 (Tex. 1980) (private right of action for "any consumer" adversely affected by a deceptive trade practice); *H.D. Oliver Funeral Apartments, Inc. v. Dignity Funeral Servs., Inc.*, 964 F. Supp. 1033 (E.D. Va. 1997) (no competitor standing for private CPA claims); *Flores v. Rawlings Co.*, 117 Haw. 153, 177 P.3d 341 (2008) (while "any person" may sue based on anticompetitive activity, suits based on deceptive trade practices are limited to consumers).

relationship, when to do so would conflict with the language of the act and its stated purposes.

¶24 Our cases also establish that the plaintiff does not have to be a consumer. We have previously concluded that the CPA is not limited to disputes between parties to a consumer transaction. *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 312-13, 858 P.2d 1054 (1993) (citing *Escalante v. Sentry Ins. Co.*, 49 Wn. App. 375, 387, 743 P.2d 832 (1987) (allowing suit by injured passenger for unfair practices in handling third party claim for underinsured motorist benefits; consumer relationship not necessary to establish standing in CPA claim)); *Gould v. Mut. Life Ins. Co. of N.Y.*, 37 Wn. App. 756, 683 P.2d 204 (1984) (third party beneficiary of life insurance policy has standing to bring CPA claim against insurer). In *Nordstrom, Inc. v. Tampourlos*, 107 Wn.2d 735, 740, 733 P.2d 208 (1987), a business had standing to bring CPA action based on trade name infringement notwithstanding absence of consumer or business relationship with defendant. The Court of Appeals has also permitted suit under the CPA in the absence of a consumer or business relationship. *E.g.*, *Holiday Resort Cmty. Ass'n v. Echo Lake Assocs.*, 134 Wn. App. 210, 135 P.3d 499 (2006) (mobile home tenants may sue distributor of unfair form lease agreement, notwithstanding lack of privity).

¶25 CCS contends, however, that suit under the CPA is also improper because this case involves a private dispute between tort adversaries. We reject this characterization because this case does not involve a contest over liability or damages resulting from an automobile accident. Rather, it involves allegedly deceptive methods used by a collection agency to recover money on behalf of an insurance company.[5]

---

[5] The dissent agrees that this case concerns a collection agency's allegedly deceptive practices to recover money.

Of course, we recognize that personal injury claims do not fall within the purview of the CPA. *See, e.g.*, *Demopolis v. Peoples Nat'l Bank of Wash.*, 59 Wn. App. 105, 796 P.2d 426 (1990) (affirming dismissal of CPA claim predicated on

¶26 We disagree with the petitioners' claim that they are entitled to rely on an "adversarial relationship exemption to the CPA," which they infer from *Marsh v. General Adjustment Bureau, Inc.*, 22 Wn. App. 933, 592 P.2d 676 (1979), and *Green v. Holm*, 28 Wn. App. 135, 622 P.2d 869 (1981). We have never recognized an "adversarial relationship" exemption, and, in fact have specifically disapproved of case law favoring such an exemption.

¶27 In *Marsh*, the Court of Appeals held the CPA excludes claims between parties whose relationship is "adversarial in nature" because it applies only to disputes between parties with a consumer relationship. *Marsh*, 22 Wn. App. at 936-37 (third party claimant lacks standing to bring a CPA claim against an insurer for bad faith claims settlement practices (relying on *Bowe v. Eaton*, 17 Wn. App. 840, 846, 565 P.2d 826 (1977))). But, as mentioned, in *Fisons* we rejected the rule that a CPA action must be brought by a consumer. We also specifically disapproved of the *Bowe* decision upon which the court in *Marsh* relied. *Fisons*, 122 Wn.2d at 312. Given our decision in *Fisons* and our disapproval of *Bowe*, *Marsh* does not support the petitioners' claim that there is a settled adversarial relationship exemption to the CPA.

¶28 In the other case cited by the petitioners, the CPA plaintiff alleged an insurer's bad faith settlement of his third party claim was a per se violation of the CPA. *Green*, 28 Wn. App. 135. The Court of Appeals affirmed the trial court's summary dismissal order on the ground the plaintiff "cannot assert a claim under the act because it does not apply to a relationship that is adversarial in nature." *Id.* at 137. But the "act" referred to by the court is the insurance code, not the CPA, and the issue was whether an insurance company was liable under the CPA for violating its obligation to exercise good faith. *Green* does not support the

allegedly defamatory remarks made by adverse party's attorney); *Stevens v. Hyde Athletic Indus., Inc.*, 54 Wn. App. 366, 773 P.2d 871 (1989) (affirming dismissal of CPA claim against shoe salesman for personal injuries suffered during a baseball game due to allegedly defective shoes).

petitioners' reliance on an adversarial exemption under the CPA.[6]

¶29 Finally, the distinction CCS attempts to draw between consensual relationships and adversarial relationships loses persuasive force when the adversarial relationship is mediated by an insurer or collection agency. Both the insurance industry and the debt collection industry are highly regulated fields. A primary purpose of the intensive regulation of these industries is to create public confidence in the honesty and reliability of those who engage in the business of insurance and the business of debt collection.[7] Our legislature has declared that violations of the regulations applicable to either industry implicate the public interest and constitute a per se violation of the CPA. While the collection practices here do not come within the regulations that apply to insurance and debt collection, there is nevertheless no doubt that after decades of intensive regulation, members of the public have come to expect that insurers and collection agencies may be held accountable for deceptive collection practices regardless of whether there is a "consensual relationship."

¶30 We hold that a private CPA action may be brought by one who is not in a consumer or other business relation-

---

[6] As discussed in *Green*, the insurance code imposes a statutory duty of good faith on "the insurer, the insured, their providers, and their representatives." RCW 48.01.030. Because the plaintiff was not the "insured," the *Green* court concluded the plaintiff lacked standing to allege a per se CPA violation based upon violation of the insurance code. Only an insured may bring a CPA claim for an insurer's breach of its statutory duty of good faith. *Tank v. State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 385, 715 P.2d 1133 (1986); *Litho Color, Inc. v. Pac. Employers Ins. Co.*, 98 Wn. App. 286, 991 P.2d 638 (1999). However, contractual privity ordinarily is not required to bring a CPA claim. *Holiday Resort*, 134 Wn. App. 210.

[7] *See* RCW 48.01.030 ("The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters. Upon the insurer, the insured, their providers, and their representatives rests the duty of preserving inviolate the integrity of insurance."); RCW 48.30.040 ("No person shall knowingly make, publish, or disseminate any false, deceptive or misleading representation or advertising in the conduct of the business of insurance, or relative to the business of insurance or relative to any person engaged therein."); RCW 48.30.010(1) ("No person engaged in the business of insurance shall engage in unfair methods of competition or in unfair or deceptive acts or practices in the conduct of such business.").

ship with the actor against whom the suit is brought. We further hold that there is no adversarial exemption from suit under the CPA. When established, the five *Hangman Ridge* elements of a CPA citizen suit assure that the plaintiff is a proper party to bring suit.

¶31 The dissent, however, would engraft a requirement that the plaintiff be in a consumer or other specified relationship with the actor-defendant onto the second *Hangman Ridge* element, occurrence of the violation *in trade or commerce*. It appears the dissent may be also be intermingling the second element, occurrence in trade or commerce, with the fourth, that the violation cause an injury to plaintiff's business or property. Dissent at 66.[8] In any event, it is clear that the dissent believes that the occurrence-in-trade-or-commerce element requires the plaintiff to be in a consumer or contractual relationship with the actor, or qualify as a plaintiff in a CPA action by virtue of some other specified relationship.

¶32 The dissent's new requirement effectively creates a sixth element, which would preclude the plaintiffs' causes of action. That outcome would defeat the goals of the CPA and fly in the face of the dissent's own implicit agreement that the collection practices here constitute deceptive practices that otherwise would fall within the CPA and give rise to a citizen's suit. The dissent agrees that these cases involve allegedly deceptive methods used by a subrogation agency (rather than tort liability or damages). Dissent at 69. Yet the dissent would allow such deceptive practices because it would impose an insurmountable obstacle to suit by persons in plaintiffs' positions. The end result would be a great disservice to the goals of the CPA.

¶33 First, as explained, the CPA's express language does not support the dissent's analysis. Nor does the second

---

[8] Perhaps this is not the dissent's intent, and instead may result from a somewhat confusing discussion addressing both the CPA's mandate that "any person" injured in business or property by a violation may bring suit and the dissent's theory that the second *Hangman Ridge* element incorporates yet another requirement, i.e., that a relationship test be satisfied.

*Hangman Ridge* element contain any such requirement. "Trade" and "commerce" are statutorily defined terms, and there is nothing in the definition of these terms that suggests any particular required relationship with the *plaintiff*. Rather, as explained, "commerce" encompasses that which "directly or indirectly affect[s] *the people of the state of Washington.*" RCW 19.86.010(2) (emphasis added). It is difficult to conceive how this can be read to require the plaintiff to have a consumer or other specialized relationship with the violator.

¶34 To the degree that the dissent appears to tie its proposed relationship requirement to plaintiff's injury, two things are immediately apparent from the act and *Hangman Ridge*. First, plaintiff's injury *is* the required connection to the defendant's unfair or deceptive acts or practices. Second, however, plaintiff's injury, the fourth element, is an element distinct from occurrence of the violation in trade or commerce, the second element. The problem for the dissent (and the petitioners) is that one can be injured in his or her business or property without being in a consumer, contractual, or other special, narrowly defined relationship with the actor.

¶35 The dissent's identification of a specified range of qualifying relationships that must exist before a CPA suit may be brought is also objectionable because it turns the *facts* that existed in prior CPA cases into *factors* that must be established. Perhaps the most obvious example is the situation in *Fisons*. There, a physician claimed that a pharmaceutical company violated the CPA by failing to warn of the dangers of a particular drug about which it had knowledge. The physician was sued after he prescribed the drug, and in turn cross-claimed against the pharmaceutical company, which argued that the CPA claim was improper because the physician was not in a consumer transaction involving the sale of goods or services. As noted, we rejected this argument, reasoning that there is no requirement that a plaintiff under the CPA be a consumer. Then, after concluding that neither the CPA nor *Hangman Ridge* re-

quires that the plaintiff be a consumer of goods or services, we noted that *"additionally,"* the physician was the logical person to bring an action under the CPA because under the learned intermediary doctrine he was the one to whom the pharmaceutical company could provide warnings and so satisfy its duty to warn. *Fisons*, 122 Wn.2d at 313.[9]

¶36 The dissent takes the fact that the physician was a learned intermediary to whom the duty to warn ran and the fact that we held the physician did not lack standing to bring a CPA claim because he was not a consumer, and turns the *Fisons* analysis into a requirement that the "learned intermediary" status of the physician constitutes one of a narrow class of special relationships that qualify an individual to bring suit. Dissent at 67-68. But our consideration of the "learned intermediary" role in *Fisons* was chiefly focused on why the physician was particularly well suited to act as a private attorney general under RCW 19.86.090. We never addressed, or even mentioned, any mandatory "relationship" standard that must be satisfied before suit can be brought under the CPA.

¶37 Indeed, by analogy, *Fisons* lends additional support to the conclusion that the respondents here should be permitted to bring suit because, like the physician in *Fisons*, they are particularly well placed to bring suit. They were the recipients of the collection notices constituting the violation of RCW 19.86.020. Indeed, no private cause of action is apt to be brought unless a plaintiff in the position

---

[9] We said:

> Additionally, in examining the nature of the relationship between a drug manufacturer, a prescribing physician and a patient, it is the physician who compares different products, selects the particular drug for the ultimate consumer and uses it as a tool of his or her professional trade. Under the learned intermediary doctrine, a drug company fulfills its duty by giving warnings regarding prescription drugs to the physician rather than to the patient. This unique relationship results in the physician being comparable to the ordinary consumer in other settings. . . . Because of this unique relationship, the drug company targets its marketing efforts toward the physician, not toward the patient. The physician, therefore, is a logical person to be the "private attorney general" under RCW 19.86.090.

*Fisons*, 122 Wn.2d at 313 (footnotes omitted).

of Panag or Stephens brings it. The purposes of the CPA would be ill served by the dissent's added requirement because it would mean that subrogation agencies could continue deceptive collection practices like those alleged here.

¶38 In the end, the dissent proposes an additional element that must be established—"a relationship test"—that does not appear in the CPA and that would, if adopted, unduly restrict the intended broad scope of the act and conflict with both its language and its purpose.

¶39 The next issue is whether, as CCS contends, the first *Hangman Ridge* element has been established. Whether a particular act or practice is "unfair or deceptive" is a question of law. *Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 150, 930 P.2d 288 (1997). A plaintiff need not show the act in question was intended to deceive, only that it had the capacity to deceive a substantial portion of the public. *Id.* In deciding whether a practice or act is "unfair or deceptive," we consider federal court decisions that have approved or rejected administrative determinations made by the Federal Trade Commission (FTC) in administering the Federal Trade Commission Act (FTCA), ch. 311, 38 Stat. 717 (1914) (codified as amended at 15 U.S.C. § 41). RCW 19.86.920 ("It is the intent of the legislature that, in construing this act, the courts be guided by final decisions of the federal courts and final orders of the federal trade commission interpreting the various federal statutes dealing with the same or similar matters."). Federal court decisions are guiding, but not binding, authority. *State v. Reader's Digest Ass'n*, 81 Wn.2d 259, 275, 501 P.2d 290 (1972).

¶40 The Court of Appeals reasoned the notices were deceptive because they look like debt collection notices and may induce people to remand payment in the mistaken belief they have a legal obligation to do so when in fact the notices represent nothing more than an unadjudicated claim for tort damages. The language in the collection notices has the capacity to deceive a substantial portion of

the public because they are representative of other notices sent to thousands of Washington citizens. *See Holiday Resort*, 134 Wn. App. at 227 (form rental agreement disseminated to 500 mobile home park owners; question of fact whether there was a capacity to deceive substantial portion of public); *cf. Burns v. McClinton*, 135 Wn. App. 285, 305-06, 143 P.3d 630 (2006) (no evidence improper billing practice affected a substantial portion of the public).

¶41 The Court of Appeals' reasoning is well supported by case law addressing analogous violations of section 5 of the FTCA, upon which the CPA is modeled. As Congress recognized with regard to the FTCA:

> "It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task. It is also practically impossible to define unfair practices so that the definition will fit business of every sort in every part of this country."

*State v. Schwab*, 103 Wn.2d 542, 558, 693 P.2d 108 (1985) (Dore, J., dissenting) (quoting H.R. CONG. REP. No. 1142, 63d Cong., 2d Sess. 19 (1914)); *see also Fed. Trade Comm'n v. Raladam Co.*, 283 U.S. 643, 648, 51 S. Ct. 587, 75 L. Ed. 1324 (1931) (scope of "unfair methods of competition" subject to regulation must be determined by " 'the gradual process of judicial inclusion and exclusion' " (quoting *Davidson v. City of New Orleans*, 96 U.S. (6 Otto) 97, 104, 24 L. Ed. 616 (1877))).

¶42 The FTC and federal courts consistently condemn attempts to collect alleged debts under the deceptive guise of a demand letter from a collection agency that either does not, in fact, exist, or is controlled by the person seeking payment of the debt at issue. *See* Jane C. Avery, Annotation, *Use of Fictitious Collection Agency to Coerce Payment as Unfair or Deceptive Practice Prohibited by § 5 of the Federal Trade Commission Act (15 USCS § 45(a)(1))*, 25 A.L.R. FED. 390 (1975). Misrepresentations as to the existence of a

collection agency constitute an unfair method of competition, an unfair or deceptive practice or act, or both. *Wm. H. Wise Co. v. Fed. Trade Comm'n*, 101 U.S. App. D.C. 15, 146 F.2d 702 (1957) (affirming FTC order to cease and desist from sending letters purporting to be demand letters by a collection agency to collect on delinquent accounts); *In re Nat'l Remedy Co.* 8 F.T.C. 437 (1925) (FTC order to cease and desist from soliciting or obtaining payment from customers by falsely stating the account had been placed "in collection" and by sending deceptive collection demand letters); *Sunshine Art Studios, Inc. v. Fed. Trade Comm'n*, 481 F.2d 1171 (1st Cir. 1973) (use of name of shell corporation deceptively created false impression that a third party collector was involved); *Gammon v. GC Servs., Ltd. P'ship*, 27 F.3d 1254, 1258 (7th Cir. 1994) (insinuating affiliation with governmental entity found deceptive: "[t]he language in the collection letter appears to be cleverly drafted in order to insinuate what obviously cannot be stated directly," i.e., that a governmental agency vouches for the demand letter). The Court of Appeals' conclusion that the collection notices at issue were deceptive as a matter of law is well supported in federal case law applying section 5 of the FTCA.

¶43 The CPA is a particularly appropriate vehicle for reaching the collection practices at issue. By broadly prohibiting "unfair or deceptive acts or practices in the conduct of any trade or commerce," RCW 19.86.020, the legislature intended to provide sufficient flexibility to reach unfair or deceptive conduct that inventively evades regulation. The deceptive use of traditional debt collection methods to induce someone to remand payment of an alleged debt is precisely the kind of "inventive" unfair and deceptive activity the CPA was intended to reach. *See Fed. Trade Comm'n v. R.F. Keppel & Bro.*, 291 U.S. 304, 308, 54 S. Ct. 423, 78 L. Ed. 814 (1934) (applying FTCA, courts should be willing to include/exclude liberally, considering the FTCA's gap-filling purpose).

¶44 CCS contends, however, that the collection notices were not deceptive because they accurately state the de-

mand was related to a subrogation claim. But as the Court of Appeals recognized, a communication may contain accurate information yet be deceptive. Deception exists "if there is a representation, omission or practice that is likely to mislead" a reasonable consumer. *Sw. Sunsites, Inc. v. Fed. Trade Comm'n*, 785 F.2d 1431, 1435 (9th Cir. 1986) (emphasis omitted). " 'In evaluating the tendency of language to deceive, the [FTC] should look not to the most sophisticated readers but rather to the least.' " *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1175 (11th Cir. 1985) (quoting *Exposition Press, Inc. v. Fed. Trade Comm'n*, 295 F.2d 869, 872 (2d Cir. 1961)). Under the FTCA, a communication may be deceptive by virtue of the "net impression" it conveys, even though it contains truthful information. *Fed. Trade Comm'n v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) (solicitation masquerading as a rebate check was misleading notwithstanding fine print notices accurately disclosing its true nature); *Floersheim v. Fed. Trade Comm'n*, 411 F.2d 874, 877 (9th Cir. 1969) (disclaimer did not cure deceptive impression that demand letter was issued by United States government, as many individuals "would be unlikely to notice respondent's inconspicuous disclaimer or to understand its import"); *Indep. Dir. Corp. v. Fed. Trade Comm'n*, 188 F.2d 468 (2d Cir. 1951) (solicitation disguised as renewal notice deceptive notwithstanding fine print disclosures). An ordinary consumer would not understand the meaning of a "subrogation claim" and likely would interpret the collection notices as representing a liquidated debt that the recipient is bound to pay rather than a potential tort claim that is subject to dispute.

¶45 CCS and amici subrogation associations also rely heavily on a California Court of Appeals decision that addresses factually similar circumstances. *Camacho v. Auto. Club of S. Cal.*, 142 Cal. App. 4th 1394, 48 Cal. Rptr. 3d 770 (2006). In *Camacho*, an insurer retained a collection agency to pursue recovery of a subrogation claim from an uninsured motorist. The motorist disputed neither liability nor damages but brought an unfair business practices act

claim against the insurer based on the methods of collection. In affirming the trial court's dismissal of the claim, the Court of Appeals did not address Camacho's argument that the collection activities were "deceptive." Instead, it analyzed only whether they were "unfair." A method of debt collection is "unfair" if it causes substantial injury, is not outweighed by countervailing benefits to consumers or competitors, and not reasonably avoidable by the consumer. *Id.* at 1403; *see also* Statements of General Policy or Interpretation Staff Commentary on the Fair Debt Collection Practices Act, 53 Fed. Reg. at 50,097, 50,107 (Dec. 13, 1988). Because Camacho could have avoided injury by complying with the law requiring all motorists to carry liability insurance, the court held the collection activities were not unfair.

¶46 Petitioners ask this court to follow *Camacho* and hold the collection activities here cannot, as a matter of law, constitute a CPA violation. But the "reasonably avoided" test does not apply to "deceptive," as opposed to "unfair," acts or practices. The universe of "unfair" business practices is broader than, and encompasses, the universe of "deceptive" business practices. Business practices that are "deceptive" are, ipso facto, "unfair." *See Cyberspace.com*, 453 F.3d at 1200 (rejecting argument that a practice is not "deceptive" if consumers could have reasonably avoided injury).

¶47 Farmers contends the notices at issue are not deceptive because the Federal Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692, specifically allows a creditor to characterize an "alleged" debt as an "amount due."[10] Thus, Farmers argues, the Court of Appeals erred in determining it was improper to refer to an unliquidated tort claim as a "debt" that is "due." The petitioners and amicus American

---

[10] The CPA contains a "safe harbor" provision for any activity or transaction that is expressly permitted by any regulatory body. RCW 19.86.170 provides, in part: "Nothing in this chapter shall apply to . . . actions or transactions permitted by any other regulatory body or officer acting under statutory authority of this state or the United States."

Insurance Association (AIA) similarly argue the collection notices are permissible under the state Collection Agency Act (CAA), chapter 19.16 RCW, because collection agencies may characterize an alleged claim as "debt." Br. of AIA & Prop. Cas. Insurers Ass'n of Am., Amici Curiae at 3 ("it is entirely lawful, fair and non-deceptive to refer to disputed obligations (albeit those arising from consumer transactions) as 'debts' and to those who owe them as 'debtors'" (citing RCW 19.16.100(11))).

¶48 Despite the parties' and AIA's reliance on the FDCPA and the CAA, neither act regulates the collection of insurance subrogation claims. The FDCPA expressly limits its reach to those obligations to pay "arising from consensual transactions, where parties negotiate or contract for consumer-related goods or services." *Bass v. Stolper, Koritzinsky, Brewster & Neider, SC*, 111 F.3d 1322, 1326 (7th Cir. 1997); *Betts v. Equifax Credit Info. Servs., Inc.*, 245 F. Supp. 2d 1130 (W.D. Wash. 2003) (no FDCPA claim for collection of fees associated with involuntary impoundment of car because law enforcement personnel, not the car owner, authorized the towing and impoundment); 15 U.S.C. § 1692a(5) (definition of "debt" includes "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment").

¶49 The CAA defines "[c]laim" as an obligation "arising out of any agreement or contract, express or implied." RCW 19.16.100(5). Because a subrogation claim against an underinsured motorist does not arise from an agreement, it is not a "claim" for purposes of the CAA. Moreover, although the CAA allows a creditor to refer to a disputed obligation as a "debt," it also requires the creditor to inform a consumer of his or her right to contest the alleged debt. A creditor cannot claim safe harbor protection when it fails to comply with all pertinent CAA regulations concerning the content of debt collection letters. In this case, CCS failed to

notify the alleged debtors of their right to contest the "amounts due" and thus could not claim safe harbor protection under the CAA even if the act did apply.

¶50 While neither the FDCPA nor the CAA is directly applicable, these acts are nevertheless important to our analysis. Consumer debt collection is a highly regulated field. When a violation of debt collection regulations occurs, it constitutes a per se violation of the CPA and the FTCA under state and federal law, reflecting the public policy significance of this industry. 15 U.S.C. § 1692*l*; *Jeter*, 760 F.2d at 1174 (violation of FDCPA is a per se "unfair or deceptive" act or practice for purposes of the FTCA); RCW 19.16.100; *Evergreen Collectors v. Holt*, 60 Wn. App. 151, 155, 803 P.2d 10 (1991) (violation of CAA is a per se violation of the CPA).

¶51 The FDCPA strictly regulates communications between collection agencies and debtors. It prohibits collection agencies from misrepresenting the legal status of a debt, falsely threatening legal action, and making other false representations to debtors. 15 U.S.C. § 1692e; *see, e.g.*, *Irwin v. Mascott*, 370 F.3d 924 (9th Cir. 2004) (threatening to sue violates the act where there is no intent to sue); *Kimber v. Fed. Fin. Corp.*, 668 F. Supp. 1480 (Ala. 1987) (threatening to file collection action when collector knows claim is time barred violates the act); *Dutton v. Wolhar*, 809 F. Supp. 1130 (D. Del. 1992) (representation that plaintiff was legally obligated to pay debt of her mother was false representation of character or legal status of debt); *In re Scrimpsher*, 17 B.R. 999 (Bankr. N.D.N.Y. 1982) (debt collection letter masquerading as a telegram is deceptive under the FDCPA). *See generally* Kevin W. Brown, Annotation, *What Constitutes False, Deceptive, or Misleading Representation or Means in Connection with Collection of Debt Proscribed by Provisions of Fair Debt Collection Practices Act (15 USCS § 1692e)*, 67 A.L.R. Fed. 974 (1984).

¶52 The CAA is our state's counterpart to the FDCPA. Like the FDCPA, it prohibits collection agencies from making false representations as to the legal status of a

debt, threatening the debtor with impairment of credit rating, attempting to collect amounts not actually owed, or implying legal liability for costs not actually recoverable, such as attorney fees or investigation fees, among other practices. *See* RCW 19.16.250 (prohibited practices).

¶53 The business of debt collection affects the public interest, and collection agencies are subject to strict regulation to ensure they deal fairly and honestly with alleged debtors. The strong public policy underlying state and federal law regulating the practice of debt collection also applies where collection practices do not fall within the laws' prohibitions. That the collection of subrogation claims is beyond the scope of the CAA does not mean deceptive subrogation collection practices are exempt from suit under the broader scope of the CPA. *See, e.g., DIRECTV, Inc. v. Cephas*, 294 F. Supp. 2d 760 (M.D.N.C. 2003) (allowing consumer protection claim to proceed even though state fair debt collection practices act did not apply to deceptive attempts to recover alleged tort damages).[11] A central purpose of the CPA is to provide " 'an efficient and effective method of filling the gaps' " in the common law and statutes. *Short*, 103 Wn.2d at 62 (quoting Craig C. Beles & Daniel Wm. Wyckoff, *The Washington Consumer Protection Act vs. The Learned Professional*, 10 GONZ. L. REV. 435, 437 (1975)). Like the FTCA, the CPA is intended to provide broader protection than exists under the common law or statute. Accordingly, debt collection activities that are not regulated under the CAA may constitute unfair and decep-

---

[11] The court in *DIRECTV* found that the alleged unfair and deceptive acts at issue were not within the scope of the North Carolina Debt Collection Act (NCDCA), N.C. GEN. STAT. § 75-50 to -56, because that act did not apply to "debt" arising through theft. *DIRECTV*, 294 F. Supp. 2d at 763-64. The court concluded, however, that the alleged acts did, however, come within the state's Unfair and Deceptive Trade Practices Act (UDTPA), i.e., that state's act comparable to our CPA, because "provisions of [the NCDCA] provide examples of behavior that will be considered unfair and deceptive within the broader scope of the UDTPA's restrictions." *Id.* at 765-66; *see also* N.C. Gen. Stat. § 75-1.1. The same is true here. Collection of subrogation claims does not fall within the CAA, but the CAA is instructive as to practices that, while not specifically prohibited by the CAA, are so much like the proscribed conduct that they fall within the broader scope of the CPA.

tive practices under the broader scope of the CPA when a collection agency holds itself out as collecting a liquidated debt when, in fact, it is pursuing recovery of an unadjudicated insurance subrogation claim.

¶54 As noted, the debtor who receives a letter masquerading as a bona fide collection notice from a regulated collection agency may be lulled into believing he or she is protected by the regulations generally applicable to debt collection.

¶55 We conclude the CPA is applicable to deceptive insurance subrogation collection activities, considering the broad legislative mandate that the business of insurance is vital to the public interest, the public policies favoring honest debt collection, and the statutory mandate to liberally construe the CPA in order to protect the public from inventive attempts to engage in unfair and deceptive business practices.[12]

¶56 CCS maintains, however, that an underinsured or uninsured motorist is more culpable than a delinquent consumer debtor and, therefore, collection agencies should be able to use tactics at least as aggressive as tactics used in the collection of disputed consumer debt. This contention lacks merit. First, it cannot be said that CCS's tactics were less aggressive than permissible under the CAA because CCS did not comply with all pertinent regulations concerning the characterization of an alleged debt. Second, and more importantly, a person's blameworthiness with respect to insurance coverage is not relevant in deciding whether a

---

[12] This is not a case where the legislature clearly did not intend for the CPA to apply, as in *State v. Schwab*, 103 Wn.2d 542, 693 P.2d 108 (1985). In *Schwab*, this court declined to allow CPA actions based on violations of the Residential Landlord-Tenant Act of 1973 (RLTA), chapter 59.18 RCW. This court considered it inappropriate to extend the CPA to landlord-tenant disputes in view of the detailed nature of RLTA, which includes an array of specific remedies. Moreover, the legislature expressly rejected a proposal to define RLTA violations as per se violations of the CPA. *Schwab*, 103 Wn.2d at 552 (the "Senate was well aware of the effect of what it was doing when it turned down the amendment extending the [CPA] to violations of the [RLTA]"). Unlike in *Schwab*, there is no evidence of legislative intent to foreclose CPA claims predicated on allegations of deceptive collection of insurance subrogation claims.

collection practice is unfair or deceptive: the focus is on the conduct of the collection agency, not the alleged debtor.[13]

¶57 Amicus curiae National Association of Subrogation Professionals (NASP) contends that extending the CPA to insurance subrogation claims unduly undermines subrogation collection efforts. According to NASP, as a result of the Court of Appeals decision, "a significant chilling effect has invaded the historical practice of subrogation." NASP Amicus Curiae Mem. in Supp. of Pet. for Review at 3. NASP fears that if the Court of Appeals decision is affirmed, a CPA claim will arise "each time there is an attempted recovery of an unliquidated sum," resulting in insurers filing suit rather than attempting voluntary recovery. It warns of adverse consequences for the consumers, including increased premiums.

¶58 But amicus curiae attorney general of Washington points out, however, that to the extent bringing insurance subrogation claims within the reach of the CPA will have a "chilling effect" on the use of deceptive collection methods, the effect will be beneficial, not adverse, to the public interest. Br. of Amicus Curiae Att'y Gen. of Wash. at 13-14.[14]

---

[13] We note that in connection with FDCPA claims, courts reject arguments that debtors who have engaged in "culpable" behavior are unworthy of protection. *Fed. Trade Comm'n v. Check Investors, Inc.*, 502 F.3d 159, 165 (3d Cir. 2007) (rejecting argument that payors of NSF checks were "criminals or tortfeasors," not "consumers," as such labels are "irrelevant"); *Silverman v. Fed. Trade Comm'n*, 145 F.2d 751, 753 (9th Cir. 1944) (describing deceptive "skip-trace" forms disguised as a notice of delivery for a "prepaid package" as "a cheap swindle, and the argument that it is less so because it may in certain cases trap swindling debtors is not one pleasing to entertain"). Whether the alleged debt sought to be collected is valid or not is irrelevant in determining whether a violation of the FDCPA is actionable. *McCartney v. First City Bank*, 970 F.2d 45 (5th Cir. 1992).

[14] CCS raises the specter of CPA claims filed against attorneys who send demand letters on behalf of their clients. The United States Supreme Court brushed aside similar concerns in deciding the FDCPA applies to attorneys who regularly engage in debt collection. *Heintz v. Jenkins*, 514 U.S. 291, 115 S. Ct. 1489, 131 L. Ed. 2d 395 (1995). The Court's rejection of a litigation exception to the FDCPA prevents regulated entities from evading regulation by conscripting lawyers to accomplish indirectly what they may not do directly. Attorneys who engage in bona fide collection activities on behalf of their clients have no need to fear suit. Moreover, this court has concluded that the CPA has no application to

¶59 The next issue is whether Panag alleges sufficient injury. CCS does not dispute the Court of Appeals' determination that Stephens sufficiently alleged injury by stating he had to take time away from his landscaping business to consult with an attorney as a result of CCS's false representations that the subrogation claim was "in collection" and would adversely affect his credit rating, resulting in a loss of business profits. *See Sign-O-Lite Signs, Inc. v. DeLaurenti Florists, Inc.*, 64 Wn. App. 553, 825 P.2d 714 (1992) (taking time away from business to respond to unfair or deceptive collection activity satisfies injury requirement when loss of business results).

¶60 Consistently with most other states, Washington requires a private CPA plaintiff to establish the deceptive act caused injury. *Hangman Ridge*, 105 Wn.2d at 794; Bob Cohen, Annotation, *Right to Private Action under State Consumer Protection Act—Preconditions to Action*, 117 A.L.R.5TH 155 (2004) (discussing injury requirement as precondition to private right of action under state consumer protection act; collecting cases). Personal injuries, as opposed to injuries to "business or property," are not compensable and do not satisfy the injury requirement. *Fisons*, 122 Wn.2d at 318; *Stevens v. Hyde Athletic Indus., Inc.*, 54 Wn. App. 366, 370, 773 P.2d 871 (1989). Thus, damages for mental distress, embarrassment, and inconvenience are not recoverable under the CPA. *Keyes v. Bollinger*, 31 Wn. App. 286, 295, 640 P.2d 1077 (1982). However, the injury requirement is met upon proof the plaintiff's "property interest or money is diminished because of the unlawful conduct even if the expenses caused by the statutory violation are minimal." *Mason v. Mortgage Am., Inc.*, 114 Wn.2d 842, 854, 792 P.2d 142 (1990) (temporary loss of use of property while brokerage company improperly withheld title constituted sufficient injury to support attorney fee award under the CPA (citing *Hangman Ridge*, 105 Wn.2d at 792)). Pecuniary losses occa-

---

the performance of legal services. *See Michael v. Mosquera-Lacy*, 165 Wn.2d 595, 200 P.3d 695 (2009); *Short*, 103 Wn.2d at 61 (CPA applies only to entrepreneurial aspects of legal practice such setting price of legal services, billing and collection, and obtaining, retaining, and dismissing clients).

sioned by inconvenience may be recoverable as actual damages. *Keyes*, 31 Wn. App. at 296; *Tallmadge v. Aurora Chrysler Plymouth, Inc.*, 25 Wn. App. 90, 605 P.2d 1275 (1979) (costs associated with traveling to dealership in reliance on false advertisements).

¶61 "Injury" is distinct from "damages." *Nordstrom*, 107 Wn.2d at 740. Monetary damages need not be proved; unquantifiable damages may suffice. *Id.* (loss of goodwill); *Nw. Airlines, Inc. v. Ticket Exch., Inc.*, 793 F. Supp. 976 (W.D. Wash. 1992) (proof of injury satisfied by "stowaway theory" where damages are otherwise unquantifiable in case involving deceptive brokerage of frequent flier miles); *Fisons*, 122 Wn.2d 299 (damage to professional reputation); *Sorrel v. Eagle Healthcare, Inc.*, 110 Wn. App. 290, 298, 38 P.3d 1024 (2002) (injury by delay in refund of money); *Webb v. Ray*, 38 Wn. App. 675, 688 P.2d 534 (1984) (loss of use of property).

¶62 According to Farmers, Panag cannot establish injury because she did not remand payment in response to the collection notices. It contends the Court of Appeals decision is inconsistent with this court's recent CPA decision in *Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*, 162 Wn.2d 59, 170 P.3d 10 (2007).

¶63 In *Indoor Billboard*, this court addressed the "causation" element in a CPA claim predicated on an allegedly deceptive billing practice. A telecommunications company billed a customer for a surcharge that it falsely characterized as a regulatory fee. The customer questioned the applicability of the surcharge but remanded payment. The customer subsequently brought a CPA claim, alleging as injury its payment of the improper fee. The plaintiff contended causation "inhered" in proof it paid more than it owed, whereas the defendant argued the plaintiff must prove the deceptive billing practice induced the payment. This court held, "A plaintiff must establish that, but for the defendant's unfair or deceptive practice, the plaintiff would

not have suffered an injury." *Id.* at 84.[15] Because the record was insufficient to determine whether the CPA plaintiff would have paid the surcharge notwithstanding the deceptive billing practice (the parties disputed whether the plaintiff knowingly agreed to pay the charge), this court concluded a material issue of fact existed as to causation.

¶64 Farmers reads *Indoor Billboard* as holding a CPA plaintiff cannot establish injury unless he or she remanded payment in reliance on a deceptive demand letter. But *Indoor Billboard* merely holds that when the alleged injury is payment of an amount not actually owed, a plaintiff must prove the deceptive billing practice induced the payment to establish causation. It does not hold that remanding payment is the only legally cognizable injury in a deceptive billing practice case.

¶65 Farmers cites other cases in support of the proposition that Panag necessarily fails to establish injury because she did not remand payment. *Demopolis v. Galvin*, 57 Wn. App. 47, 786 P.2d 804 (1990); *Crane & Crane, Inc. v. C&D Elec., Inc.*, 37 Wn. App. 560, 683 P.2d 1103 (1984); *Camacho*, 142 Cal. App. 4th 1394; *Flores v. Rawlings Co.*, 117 Haw. 153, 177 P.3d 341 (2008).

¶66 In *Demopolis*, the plaintiff purchased real property that was encumbered by an allegedly usurious loan agreement. After the third party promisor defaulted, the lender brought a foreclosure action. Demopolis counterclaimed

---

[15] It is less clear whether this court rejected the defendant's position that proof of reliance is always necessary to establish causation. Depending on the deceptive practice at issue and the relationship between the parties, the plaintiff may need to prove reliance to establish causation, as in *Indoor Billboard*. Most courts have concluded a private right of action under state consumer protection law does not necessarily require proof of reliance, consistently with legislative intent to ease the burden ordinarily applicable in cases of fraud. *See, e.g., Sanders v. Francis*, 277 Or. 593, 561 P.2d 1003 (1977) (proof of reliance necessary in claim alleging false advertising, but not necessary where deceptive act involves material omission). *See generally* Cohen, *supra*, § 10, at 222 (annotating cases pertaining to reliance in consumer fraud claims); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, NA*, 85 N.Y.2d 20, 647 N.E.2d 741, 744, 623 N.Y.S.2d 529 (1995) ("while the statute does not require proof of justifiable reliance, a plaintiff seeking compensatory damages must show that the defendant engaged in a material deceptive act or practice that caused actual, although not necessarily pecuniary, harm").

with a CPA action. The Court of Appeals held the plaintiff failed to meet the injury requirement announced in *Hangman Ridge* because the third party obligee, not the plaintiff, paid the allegedly usurious loan fee. Demopolis, by contrast, was subject to a legal rate of interest. The cost of instituting a CPA action to challenge the underlying loan agreement could not, itself, constitute injury.

¶67 In *Sign-O-Lite*, 64 Wn. App. at 564, the Court of Appeals similarly held that a consumer's "mere involvement in having to defend against [Sign-O-Lite Signs] collection action and having to prosecute a CPA counterclaim is insufficient to show injury to her business or property." In that case, however, the CPA plaintiff additionally alleged as injury loss of business profits as a result of the time she was required to leave her business and respond to the improper payment demands. The court found this allegation sufficient to meet the injury requirement: "Given that the clear purpose of the CPA is to deter and protect against unfair or deceptive acts or practices, the evidence in this case— including the fact that DeLaurenti is self-employed and the sole owner of her business—is sufficient to support an inference that there was some injury to DeLaurenti's business, even though as discussed infra that injury was not quantifiable." *Id.* (emphasis omitted).

¶68 *Crane* is a pre-*Hangman Ridge* case. A business brought a CPA claim against an electrician who made faulty repairs, resulting in a fire. The plaintiff alleged the electrician misrepresented his qualifications. The court held the evidence was insufficient to establish a CPA violation because there was no evidence of a causal relationship between the misrepresentations and the defendant's injury, as the evidence showed the business routinely hired the electrician. "Absent evidence of inducements, the false representations cannot be the basis for allowing a recovery under the CPA." *Crane*, 37 Wn. App. at 563. *Crane* is consistent with *Indoor Billboard*. As in that case, the CPA plaintiff was required to prove a causal connection between the deceptive act and the alleged injury.

¶69 In *Camacho*, the court held an uninsured motorist could not establish injury arising from allegedly unfair attempts to collect on a subrogation claim because he conceded liability and damages. The court noted however, the case would be different if the defendant sought "to collect monies that are not actually owed." *Camacho*, 142 Cal. App. 4th at 1405. The court also clarified that it was addressing the "substantial injury" requirement of the three-factor "unfairness" test, not whether injury was met for purposes of standing. *Id. Camacho* is distinguishable because here there was, in fact, an attempt to collect moneys not actually owed. Farmers own adjuster concluded Panag was 40 percent liable, yet an attempt was made to recover the full loss.

¶70 In *Flores*, the plaintiffs brought a CPA claim alleging the defendant unlawfully engaged in unregistered collection activities, a per se violation of the state CPA. The defendant collection agency attempted to collect on a healthcare provider's claim for reimbursement of medical expenses. The plaintiffs alleged they were injured because they remanded payment in response to the unlawful collection notices. The court concluded they were not injured, however, because they paid less than they actually owed.

¶71 Farmers reads *Flores* as holding a CPA claimant does not suffer legally cognizable injury unless he or she is induced to pay more than what is actually owed. As in *Indoor Billboard*, however, the decision cannot be read so broadly. *Flores* does not hold that remanding payment in response to an improper collection notice is a necessary precondition to establish injury. Nor does it hold that injury cannot be established if the plaintiff actually owes more than the amount paid. In *Flores*, the only deceptive practice at issue—engaging in unregistered collection activities—was not causally related to the alleged injury. *Flores*, like *Indoor Billboard*, establishes that violation of the CPA requires some causal relationship between the unfair or deceptive trade practice and the alleged injury to support a private right of action.

¶72 Indeed, the court in *Flores* recognized that the validity of the debt may be irrelevant, depending on the nature of the violation and injury alleged. *Flores*, 177 P.3d at 358. The Hawaii Supreme Court cited with approval a Court of Appeals case that held injury exists in a CPA claim based on unfair debt collection activities if " 'expenses were incurred because of the statutory violation and not because of a valid debt.' " *Id.* (quoting *Wiginton v. Pac. Credit Corp.*, 2 Haw. App. 435, 444, 634 P.2d 111 (1981)). The issue is whether the plaintiff was wrongfully induced to pay money on a debt not owed " 'or to incur expenses that would not otherwise have been incurred.' " *Id.* (quoting *Wiginton*, 2 Haw. App. at 445 (consumer-plaintiff's damages may include out-of-pocket expenses for a money order, gasoline, parking, and wear and tear on automobile that resulted from unfair business practice)).

¶73 In this case, unlike in *Indoor Billboard*, *Demopolis*, *Crane*, and *Flores*, the plaintiff alleged as injury the expenses incurred in dispelling her uncertainty about the legal ramifications of the subrogation claim, including out-of-pocket expenses for postage, parking, and consulting an attorney. The trial court found Panag's allegations insufficient to establish injury, particularly considering she already retained a lawyer in connection with the automobile accident. The Court of Appeals disagreed, viewing the alleged injuries as independent from the personal injury claim.

¶74 Consulting an attorney to dispel uncertainty regarding the nature of an alleged debt is distinct from consulting an attorney to institute a CPA claim. *Compare Demopolis*, 57 Wn. App. 47 (litigation expenses incurred to institute CPA counterclaim does not constitute injury), *with Sign-O-Lite*, 64 Wn. App. 553 (loss of business profits resulting from time spent embroiled in disputing improper payment demand constitutes injury). Although the latter is insufficient to show injury to business or property, the former is not. Investigation expenses and other costs resulting from a deceptive business practice sufficiently establish injury. *See*

*State Farm Fire & Cas. Co. v. Quang Huynh*, 92 Wn. App. 454, 470, 962 P.2d 854 (1998) (although insurance company did not pay chiropractor's false billing statements, it sufficiently established injury by proving it "incurred expenses for experts, interpreters, transcribers, attorneys, and its own employees during its investigation").

¶75 Decisions concerning the extent to which the FDCPA allows recovery of pecuniary losses are instructive in defining the scope of injuries that may form the basis of a CPA claim based on deceptive collection activities.[16] A plaintiff need not remand payment to prove injury for purposes of a FDCPA claim. A plaintiff may recover as damages out-of-pocket expenses directly resulting from the deceptive collection notice. Thus, a plaintiff may recover the cost of hiring an attorney if he or she did so as a result of a collection notice that misleadingly threatens legal action. *Jeter*, 760 F.2d 1168. For example, in *Jeter*, a debtor hired an attorney upon receiving a deceptive demand letter threatening legal action. The court held the debtor could prevail if she hired the lawyer as a direct result of the deceptive collection letter. That Jeter did not remand payment in reliance on the letter did not preclude her claim:

> It is true that Jeter might have been injured worse. Upon receiving one or both of the letters, she could have immediately paid the debt, thinking she was about to be sued. This case, therefore, may well illustrate one of the purposes [of the FDCPA]. Congress apparently was aware that a false threat to sue in the near future might well be used to induce premature payment of an alleged debt with respect to which the consumer has a legitimate defense.

*Id.* at 1178 n.11.

¶76 To establish injury and causation in a CPA claim, it is not necessary to prove one was actually deceived. It is sufficient to establish the deceptive act or practice proxi-

---

[16] Unlike the CPA, a FDCPA claim does not require proof of actual damages. It permits recovery of both general and special damages. Although we recognize that recovery under the CPA is more limited in scope than under the FDCPA, we look to cases considering the overlapping area of recoverable damages for guidance.

mately caused injury to the plaintiff's "business or property." If the deceptive act actually induces a person to remand payment that is not owed, that will, of course, constitute injury. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 340, 99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979) (" 'A person whose property is diminished by a payment of money wrongfully induced is injured in his property.' " (quoting *Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390, 396, 27 S. Ct. 65, 51 L. Ed. 241 (1906))). But the recipient of a deceptive demand payment may be injured in other ways. *See Huynh*, 92 Wn. App. at 468 (although insurance company did not pay chiropractor's false billing statements, it sufficiently established injury by proving it "incurred expenses for experts, interpreters, transcribers, attorneys, and its [own] employees" during its investigation); *see also Coventry Assocs. v. Am. States Ins. Co.*, 136 Wn.2d 269, 961 P.2d 933 (1998) (bad faith investigation is actionable regardless of whether insurer properly denied coverage; expenses incurred in investigating claim establish injury and are recoverable as actual damages). In cases of false advertising, out-of-pocket expenses are recoverable, such as the cost of parking, driving, or making a trip to the store to buy something. *DeSantis v. Sears, Roebuck & Co.*, 148 A.D.2d 36, 543 N.Y.S.2d 228 (1989); *Beslity v. Manhattan Honda*, 120 Misc.2d 848, 854, 467 N.Y.S.2d 471 (1983) (actual damages include cost of traveling to business because of deceptive ad); *Keyes*, 31 Wn. App. at 296; *Tallmadge v. Aurora Chrysler Plymouth, Inc.*, 25 Wn. App. 90, 605 P.2d 1275 (1979) (costs associated with traveling to dealership in reliance on false advertisements).

¶77 If the investigative expense would have been incurred regardless of whether a violation existed, causation cannot be established. *See Sambor v. Omnia Credit Servs., Inc.*, 183 F. Supp. 2d 1234 (Haw. 2002) (expenses associated with determining whether the collection agency was registered under state law does not constitute injury because they would have been incurred even if the collection agency was registered).

¶78 In this case, whether Panag actually suffered any investigation expenses beyond the expenses of litigating her personal injury claim raises a question of fact.

¶79 Farmers has also submitted a number of cases in support of the proposition that the plaintiffs' purchases of credit reports and credit monitoring services does not establish injury because such expenses constitute potential injury, not actual injury. *See Kahle v. Litton Loan Servicing, Ltd. P'ship*, 486 F. Supp. 2d 705, 713 (S.D. Ohio 2007); *Forbes v. Wells Fargo Bank, NA*, 420 F. Supp. 2d 1018 (D. Minn. 2006); *Randolf v. ING Life Ins. & Annuity Co.*, 486 F. Supp. 2d 1, 8 (D.C. Cir. 2007). These are "lost data" cases involving plaintiffs seeking compensation for the cost of monitoring their credit to avoid a potential harm resulting from the alleged negligent failure to secure the plaintiffs' personal information. Unlike in the "lost data" cases, the plaintiffs here do not seek recovery of this type of expense as a prophylactic measure against some potential future harm. The expenses incurred by the plaintiffs to monitor their credit represent a completed harm.

## CONCLUSION

¶80 We hold that the plaintiffs' standing is properly analyzed in the context of applying the five-part *Hangman Ridge* test. We hold that a CPA claim may be predicated on the deceptive characterization of an unadjudicated insurance subrogation claim as a liquidated debt that must be immediately paid. We further hold that a CPA plaintiff alleging deceptive collection methods need not remand payment to establish injury: other expenses incurred as a result of the deceptive practice may satisfy the injury element. We affirm the Court of Appeals.

SANDERS, CHAMBERS, FAIRHURST, and STEPHENS, JJ., concur.

¶81 C. JOHNSON, J. (dissenting) — The majority rewrites the Consumer Protection Act (CPA), chapter 19.86 RCW,

extending the statute far beyond its express reach. A private CPA claim for a deceptive practice involves, among other things, a deceptive act or practice, which occurs in trade or commerce. Until today, *trade or commerce* has meant some sort of consumer, intended beneficiary, or intermediary (i.e., special) relationship. But never has the CPA been extended to an adversarial relationship arising out of tortious conduct, and the CPA, as written, does not support such an expansion. The relationship presented here arises out of tortious conduct, a relationship that the CPA was not intended to protect, as written.

¶82 But in rewriting the statute, the majority effectively removes the second element of the well-settled *Hangman Ridge* analytical framework. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 719 P.2d 531 (1986). Although the majority recognizes this case involves statutory interpretation, it fails to follow cases establishing the statutory requirements necessary to support a CPA claim. The issue in this case is quite simple; we are interpreting the *Consumer* Protection Act, not the *collection* (*subrogation*) protection act. The Court of Appeals should be reversed.

¶83 The majority first construes RCW 19.86.090 in a manner that permits "*any person*" to bring a CPA claim. Majority at 39. But the sentence containing this quoted language provides that this "any" person must be "injured in his or her business or property *by a violation of RCW 19.86.020. . . .*" RCW 19.86.090 (emphasis added). In determining whether a CPA claim can proceed, we established five elements in *Hangman Ridge*. The majority rewrites this framework to require only four elements. But if we require, as we must, all five elements, Rajvir Panag and Michael Stephens fail to prove the second element: that the unfair or deceptive practice occurred "(2) in trade or commerce." *Hangman Ridge*, 105 Wn.2d at 784 (setting out the conjunctive five elements for establishing a private CPA

claim).[17] Since that element traces the statutory requirements, we should not take that requirement out.

¶84 Although the majority points to cases where the court has permitted a plaintiff's private action under the CPA to be predicated on something other than a strict consumer relationship, the majority's extension of such precedent to the subrogation claims at issue here is too simplistic.[18] Of the courts that have extended the *trade or commerce* element of the *Hangman Ridge* analysis to something more than a classic consumer relationship, each has required that the relationship giving rise to the claim have some sort of intended beneficiary or intermediary (i.e., special) relationship. *See, e.g.*, *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 858 P.2d 1054 (1993) (unique intermediary relationship exists between doctor and pharmaceutical company); *Escalante v. Sentry Ins.*, 49 Wn. App. 375, 743 P.2d 832 (1987) (injured passenger already covered by insurance policy enabling CPA claim for unfair practices; intended beneficiary case); *Gould v. Mut. Life Ins. Co. of N.Y.*, 37 Wn. App. 756, 683 P.2d 204 (1984) (intended third-party beneficiary of life insurance policy may bring CPA claim against insurer). In each of these cases, a consensual business relationship provides

---

[17] The majority suggests that this dissent is "intermingling the second element, occurrence in trade or commerce, with the fourth, that the violation cause an injury to plaintiff's business or property." Majority at 44. This is not the case. Indeed, the analytical framework consists of five conjunctive elements. A plaintiff must establish each element to bring a successful CPA claim. In other words, for purposes of bringing a CPA claim, it is irrelevant that a person was injured in their business or property by a deceptive act or practice when such injury did not occur in *trade or commerce. Hangman Ridge*, 105 Wn.2d at 785 (the first "two elements may be established by a showing that (1) an act or practice which has the capacity to deceive . . . (2) has occurred in . . . trade or commerce"). As discussed in this dissent, because Panag and Stephens cannot establish the act or practice took place in trade or commerce, their CPA claim (and the majority's analysis) must fail.

[18] The majority cites *Nordstrom* for the proposition that it is not necessary to establish a consumer relationship to bring a CPA action. *Nordstrom, Inc. v. Tampourlos*, 107 Wn.2d 735, 740, 733 P.2d 208 (1987) (CPA action based on trade name infringement). But the CPA permits claims for "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." RCW 19.86.020. *Nordstrom* is an unfair competition case and is irrelevant with respect to this deceptive act or practice case.

the foundation of the relationship prior to the subsequent dispute. More simply, this line of cases permits CPA claims that arise from a consumer relationship, direct or indirect. But none involve a relationship formed in tortious conduct and none support the majority's expansion.[19]

¶85 Specifically, the *Fisons* decision weakens the majority's position that an adversarial relationship can give rise to a CPA claim as opposed to consumer relationship, direct or indirect. In *Fisons*, we concluded that a rule requiring a CPA claim to be based only on a consumer transaction has been eroded by later cases. *Fisons*, 122 Wn.2d at 312. There, we relied on the leading CPA case, *Hangman Ridge*, which does not include a rule requiring a CPA claimant to be a *direct consumer* or in a *direct contractual relationship* with the defendant. But, in extending the second element, *trade or commerce*, to the facts in *Fisons*, we explicitly remarked that "[t]his unique relationship results [from] the physician being *comparable to the ordinary consumer* in other settings." *Fisons*, 122 Wn.2d at 313 (emphasis added). In other words, *Fisons* involved an indirect consumer relationship.

¶86 Here, Stephens and Panag lack the statutory basis to bring a CPA claim. Their relationship with the defendant is not that of an ordinary consumer, direct or indirect; rather, it is an adversarial relationship arising in tort. RCW 19.86.090 expressly states, "Any person who is injured in his or her business or property by a *violation* of RCW 19.86.020 . . . , may bring a [CPA claim] to recover the actual damages sustained by him or her. . . ." (Emphasis added.) But Panag and Stephens are not "[a]ny person," as defined

---

[19] The majority appears to imply that this analysis has conjured up some "specified range of qualifying relationships that must exist before a CPA suit may be brought . . . into *factors* that must be established." Majority at 45. In so doing, the majority discounts or disregards the common thread that runs through each of these cases, an underlying consensual business transaction (direct or indirect). Here, no such commonality exists. Instead, the facts in this case show an adversarial relationship arising in tort. Such relationship is not analogous to nor the logical extension of our precedent interpreting *trade or commerce*. The majority does not offer adequate authority on why this precedent should be overturned or disregarded in this case.

by the statute because they cannot establish a violation of RCW 19.86.020 occurred.

¶87 To establish a violation of RCW 19.86.020 requires, among other things, that the actor employs "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any *trade or commerce.*" (Emphasis added.) This element of trade or commerce is element two of the *Hangman Ridge* analysis. As discussed above, our cases have extended this element to certain relationships that arise from or derive out of a consumer relationship (i.e., direct or indirect). Here that relationship is lacking. Panag and Stephens were involved in separate automobile accidents. The drivers of the other cars were insureds of Farmers Insurance (in Panag's case) and Omni Insurance (in Stephens' case). Farmers and Omni both subrogated their claims to Credit Control Services (CCS). CCS then contacted Panag and Stephens with respect to the subrogation, which gave rise to the dispute presented here. This is certainly not a classic consensual business transaction; Panag and Stephens did not agree to engage in some sort of consumer transaction with CCS. Neither Panag nor Stephens are the intended beneficiary, named or implied, in the other drivers' insurance policy. And, the relationship is wholly dissimilar to the special intermediary relationship found with, for example, a doctor working with a drug company for the benefit of the doctor's patient. Instead, here, CCS works with the insurance company for the benefit of the insurance company, not Panag and Stephens. In other words, Panag and Stephens do not have a relationship with CCS that permits a claim for damages under the CPA. Rather, their adversarial relationship arises in tort; a relationship for which the CPA has never been extended, until today.[20]

¶88 The majority attempts to distinguish this fact by asserting this matter involves allegedly deceptive methods

---

[20] Although the CPA, as applied today, has been changed over the years through judicial interpretation, the majority does not present adequate authority to justify extending the CPA in the context of an adversarial relationship arising in tort.

used by a subrogation agency and not liability or damages from the tort. While this is true, such analysis either mischaracterizes the application of *Hangman Ridge*'s second element or removes it completely. The majority fails to find or cite authority extending this element to an adversarial relationship that arose in tort, implicated here. Majority at 42 (conceding this matter arises out of an adversarial relationship).[21] As such, the petitioners' claim of an "adversarial relationship" exemption to the CPA remains, which should leave Panag's and Stephens' claims beyond the scope of the CPA.

¶89 Next, based on the now rewritten CPA, the majority engages in a curious analysis regarding per se violations of the CPA.[22] In doing so, the majority points to the FDCPA (Federal Fair Debt Collection Practices Act (Collection Agency Act), 15 U.S.C. § 1692) and our state's counterpart, the CAA. Majority at 53. But these Acts do not apply to the subrogation claims at issue here.

¶90 The FDCPA expressly limits its reach to those obligations to pay "arising from *consensual transactions*, where parties negotiate or contract for consumer-related goods or services." *Bass v. Stolper, Koritzinsky, Brewster & Neider, SC*, 111 F.3d 1322, 1326 (7th Cir. 1997) (emphasis added). Similarly, the CAA defines "[c]laim" to "mean[ ] any obligation for the payment of money or thing of value arising out of any agreement or contract, express or implied." RCW 19.16.100(5). Because a subrogation claim against an underinsured motorist does not arise from an agreement, it is not a "claim" for purposes of the CAA. As such, neither the FDCPA nor the CAA applies to obligations arising from

---

[21] This is the same point in the analysis where the Court of Appeals strays from the well-settled precedent regarding the *trade or commerce* element.

[22] Notably, to be successful in bringing a per se violation requires proof that a party violated a statute that proscribes the particular practice used. *See Lidstrand v. Silvercrest Indus.*, 28 Wn. App. 359, 623 P.2d 710 (1981). No facts are presented by Panag, Stephens, or the majority that CCS violated a statute that would give cause for a per se violation. Majority at 44. As such, Panag and Stephens would not be successful in bringing a per se violation and neither have argued that theory to us. *See* Panag's Answer to Pets. for Discretionary Review at 12 ("This case does not involve a per se CPA claim. . . .").

a tortious relationship, which is the type of relationship at issue here. The majority concedes this point.

¶91 Nonetheless, the majority expends numerous pages of analysis on this issue. In doing so, the majority essentially argues that a reasonable person would believe she or he is protected under these inapplicable acts, so she or he should be able to rely on these inapplicable acts as if the acts did apply to subrogation claims. In doing so, the majority bootstraps the relevance (or lack thereof) of two inapplicable acts in an effort to reach the conclusion that the CPA applies in this case.

¶92 One example of this curious line of argument is found in the majority at 43:

> Our legislature has declared that violations of the regulations applicable to [insurance and debt collection] implicate the public interest and constitute a per se violation of the CPA. *While the collection practices here do not come within the regulations that apply to insurance and debt collection,* there is nevertheless no doubt that after decades of intensive regulation, members of the public have come to expect that insurers and collection agencies may be held accountable for deceptive collection practices regardless of whether there is a "consensual relationship."

(Emphasis added.) The majority does not offer adequate authority to support this claim of perceived accountability based on admittedly irrelevant acts. The majority offers no adequate basis for why such irrelevant analysis should supplant our *Hangman Ridge* factored analysis, which requires the deceptive practice or act to occur in trade or commerce, as defined by statute and interpreted by our cases. And the majority does not cite or find any Washington case applying the *Hangman Ridge* factors with the analysis presented by the majority; nor do the parties advance such an argument.[23] In fact, Panag even titles one

---

[23] Panag and Stephens explicitly disclaim any relevance of the FDCPA to this case. Resp't's Answer to Amici Mem. at 5 ("the FDCPA is . . . wholly inapplicable to these matters"), n.7 ("since subrogation claims are not debts under the

argument "Off Point Statutes or Cases From Other States Are Irrelevant." Resp't Rajvir Panag's Answer to Pets. for Discretionary Review at 13, 15 (arguing irrelevant statutes and cases cannot change the CPA, as enacted by our legislature).

¶93 Further, considering there has been, as the majority claims, "decades of intensive regulation," (majority at 43) it certainly stands to reason then that these regulatory bodies would have created a law permitting CPA claims based on subrogation claims stemming from relationships arising in tort. But no such law exists, and the absence of such law after decades of regulation undermines rather than supports the majority's analysis. We should refuse to create judicially such a rule today, by rewriting the CPA.

¶94 Instead, subrogation is outside the scope of both the FDCPA and the CAA. As such, resorting to cases interpreting the FDCPA or the CAA is not helpful in analyzing the CPA.[24]

---

[FDCPA], a plaintiff would not be entitled to any of the Act's protections"); *see also* Resp't Rajvir Panag's Answer to Pets. for Discretionary Review at 13 ("The FDCPA Is Inapplicable and Unhelpful."). By logical extension, the parties' position on this issue would be the same for the CAA.

[24] For example, the majority cites *DIRECTV, Inc. v. Cephas*, 294 F. Supp. 2d 760 (M.D.N.C. 2003) (allowing CPA claim to proceed even though the state FDCPA did not apply to deceptive attempts to recover alleged tort damages). In *DIRECTV*, the court found that the alleged unfair and deceptive acts at issue were not within the scope of the North Carolina Debt Collection Act (NCDCA), N.C. Gen. Stat. § 75-50 to -56, because the act did not apply to "debt" arising through theft. But the court concluded the alleged acts did come within the state's Unfair and Deceptive Trade Practices Act (UDTPA), N.C. Gen. Stat. § 75-1.1. The court then relied on examples provided under the NCDCA that are considered deceptive within the broader scope of the UDTPA's restrictions and held *DIRECTV* could be liable for its acts. *DIRECTV*, 294 F. Supp. 2d at 765; *see also* N.C. Gen. Stat. § 75-1.1 (North Carolina's UDTPA). Here, the majority seeks to make a similar connection between the CAA and the CPA (i.e., using provisions of the inapplicable CAA to create liability under the broader scope of the CPA). In so reasoning, the majority asserts the UDTPA is similar to our CPA. Majority at 54 n.11. But North Carolina's UDTPA is not similar in at least one critical respect to our CPA. *See* N.C. Gen. Stat. § 75-51 ("No debt collector shall collect or attempt to collect any debt . . . *owing from a consumer*. . . ." (emphasis added)). Indeed, the majority's argument is premised on the idea that one need not be a consumer to invoke the CPA. Majority at 39. Considering these facts, *DIRECTV* is distinguishable on this point. Further, as discussed above, our cases do not invite extending the *trade or commerce* element to include a relationship arising in tort.

¶95 In this case, we should be interpreting the requirements of the CPA. The CPA is limited to protecting consumer relationships and those derived from consumer relationships. The CPA was not designed to nor should it be rewritten to regulate relationships arising out of tortious conduct. The Court of Appeals should be reversed.

ALEXANDER, C.J., and OWENS and J.M. JOHNSON, JJ., concur with C. JOHNSON, J.

Reconsideration denied August 17, 2009.